UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
PHYLLIS COLEMAN, Individually and as the
Administratrix of the Estate of Santia N. Williams,

                           Plaintiff,

         - against -

COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE
DEPARTMENT, SUFFOLK COUNTY SHERIFFS
DEPARTMENT, and Police Officers, Deputy Sheriffs,
and/or Detectives JOHN AND JANE DOES 1-10,
CHRISTOPHER VERWYS, badge #5459, in his
individual and official capacities, JASON MORGE,
badge ID #1729, in his individual and official capacities,
JOHN BRUNKARD, badge #5692, in his individual and
official capacities, CORRINE TORRES, badge ID #509,
in her individual and official capacities, MIGUEL VIAS,
badge #5671, in his individual and official capacities,
JOHN MCAULEY, badge #5534, in his individual and
official capacities, JOHN MECURIO, badge #5414,
in his individual and official capacities, NICHOLAS
ASPROMGOS, badge ID # 5683, in his individual and
official capacities, JAMES O'CALLAGHAN,
badge #1523, in his individual and official capacities,
SAMMY SALEH, badge #5657, in his individual and
official capacities, GREGORY POULETSOS, badge #549,
in his individual and official capacities, LUIS RUIZ,
badge #5804, in his individual and official capacities,
VALENTIN ROSADO, badge #5801, in his individual and
official capacities, FRANK ORTIZ, badge #5550, and
SERGEANT CHRISTOPHER LOVE, in his individual
and official capacities.

                           Defendants.
----------------------------------------------------------------X

## MEMORANDUM AND ORDER
12 CV 3509 (DRH) (ARL)

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★    MAR 3 1 2016    ★

LONG ISLAND OFFICE

**APPEARANCES:**

**LAW OFFICES OF FREDERICK K. BREWINGTON**
Attorneys for Plaintiff
556 Peninsula Boulevard
Hempstead, NY 11550
BY:    Frederick K. Brewington, Esq.

**SUFFOLK COUNTY ATTORNEY'S OFFICE**
Attorneys for Defendants
100 Veterans Memorial Highway

P.O Box 6100
Hauppauge, NY 11788
BY:    Brian C. Mitchell, Esq.
       Arlene S. Zwilling, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Phyllis Coleman ("plaintiff" or "Coleman") commenced this action on behalf of

her deceased daughter Santia Williams ("Williams") against defendants County of Suffolk,

Suffolk County Police Department, Suffolk County Sheriff's Department, and police officers,

deputy sheriffs, and/or detectives John and Jane Does 1-10, Christopher Verwys ("Verwys"),

Jason Morge ("Morge"), John Brunkard ("Brunkard"), Corrine Torres ("Torres"), Miguel Vias

("Vias"), John McAuley ("McAuley"), John Mecurio ("Mecurio"), Nicholas Aspromgos

("Aspromgos"), James O'Callaghan ("O'Callaghan"), Sammy Saleh ("Saleh"), Gregory Pouletsos

("Pouletsos"), Luis Ruiz ("Ruiz"), Valentin Rosado ("Rosado"), Frank Ortiz ("Ortiz"), and

Sergeant Christopher Love ("Love") (collectively, "defendants") asserting, *inter alia*, due process

claims pursuant to 42 U.S.C. § 1983.[1]   The claims arise out of defendants' alleged conduct in

response to various 911 calls placed by Williams regarding incidents with her former boyfriend

Jason Jenkins ("Jenkins"), who ultimately shot and killed Williams and himself.

Presently before the Court is the defendants' motion seeking leave to file under seal

documents filed in opposition to their motion for summary judgment.   Additionally before the

Court is the motion of Newsday LLC ("Newsday") and News 12 Company ("News 12")

(collectively, the "Press Intervenors") to intervene for the purpose of, *inter alia*, opposing that

motion, and the motion of Suffolk County Police Benevolent Association ("PBA") to intervene to

---

[1]   According to defendants, "Pouletsos and Torres are not police officers, [but] they are
civilian radio dispatch officers employed by the County of Suffolk."   (Defs.' Mem. in Supp. of
Summ. J. at 26.)

2

oppose the Press Intervenors' motion. Also before the Court is defendants' motion for summary judgment. For the reasons set forth below, the defendants' motion to seal is denied, the Press Intervenors' motion to intervene is granted, the PBA's motion to intervene is granted, and the defendants' motion for summary judgment is granted.

## DEFENDANTS' MOTION TO SEAL AND THE PRESS INTERVENORS' AND PBA'S MOTIONS TO INTERVENE

### *BACKGROUND*

*Confidentiality Agreement*

On September 3, 2013, Magistrate Judge Arlene R. Lindsay "So Ordered" a confidentiality agreement entered into between the parties (the "Confidentiality Order"). That agreement provided that "Suffolk County Police Department Internal Affairs Bureau investigation files and their attendant attachments" were to remain confidential. (DE 22 ¶ 2(b).) According to the agreement, counsel were to use confidential documents "solely for the purposes of this litigation . . . and [were] not, without the prior consent of the defendants' counsel, [to] make the confidential documents available to any other person unrelated to the litigation." (*Id.* ¶ 2(e).) The agreement also provided that "[i]n the event that a party wishes to use a document properly designated as confidential filed in this litigation, such document (or part thereof) shall be filed, upon proper notification and request to the court, under seal and maintained under seal by the Court pursuant to the Court's rules and procedures." (*Id.* ¶ 2(g).) Moreover, pursuant to the agreement, "[c]ounsel for the plaintiff, at any time, may seek the designation of any document or documents previously designated as confidential to no longer be considered confidential and plaintiff does not waive any right to object, oppose, or undesignated[] any document designated as confidential." (*Id.* ¶ 2(i)

*The Plaintiff's Pre-motion Conference Letter*

On October 3, 2014, the defendants filed a letter request seeking a pre-motion conference with respect to defendants' anticipated motion for summary judgment (Docket Entry ("DE") 47), and on October 9, 2014 plaintiff responded (DE 49). Subsequently, the parties jointly requested that the plaintiff's response be filed under seal, "as the letter references information which the parties agree should not be available for public viewing." (DE 50 at 1.) The Court denied that motion with the right to renew because the parties failed to provide any legal analysis in support of their request. On November 7, 2014, the parties renewed their request to seal the plaintiff's opposition, (DE 51), and the Court granted that request on November 12, 2014.

*Summary Judgment Papers*

On March 16, 2015, defendants made a letter request to "file portions of [plaintiff's opposition to their summary judgment motion] on the ECF in a redacted fashion." (DE 57 at 1.) In the letter, defendants stated that "[t]he requested redactions appl[ied] to portions of the plaintiff's . . . papers and exhibits that refer to the Internal Affairs [Unit] investigation and report [("IAU Report")] and the content thereof." (*Id.*) Indeed, defendants seek to redact portions of the plaintiff's Memorandum in Opposition to Summary Judgment, exhibits, and attached depositions discussing the internal investigation and charges against defendants. However, the defendants did not file their motion in accordance with the Eastern District's instructions contained on the EDNY website, and the Court directed the defendants to refile their motion in accordance with the instructions. Defendants refiled the motion on April 4, 2015. (DE 63.) Plaintiff opposed the motion and also sought that "the previously entered Order designating [as confidential] the [IAU Report] issued during the discovery period be lifted and the IAU [R]eport

4

no longer be considered a confidential document." (DE 59 at 7.) The motion to seal is presently before the Court.[2]

*Intervenors*

Additionally, on April 2, 2015, the Press Intervenors moved to intervene "for the limited purposes of (1) challenging the Court's November 12, 2014 order, sealing Plaintiff's opposition to [Defendants'] motion for a pre-motion conference (Docket No. 49); (2) opposing [Defendants'] application to seal or redact Plaintiff's opposition to defendants' motion for summary judgment (Docket No. 57); (3) unsealing any additional sealed judicial records or docket entries in this litigation; and (4) obtaining such other and further relief as may be just, proper, and equitable." (Press Intervenors' Notice of Motion at 1-2.) Thereafter, the PBA moved to intervene "for the limited purpose of opposing Intervenor, Newsday, LLC/News 12 Company's motion to unseal documents that relate to [IAU Report], Case #11-704i, and the contents thereof as well as unsealing all entries in the electronic docket as it pertains to the collectively bargained rights of the PBA and its members." (PBA's Mem. at 1.)

## I. *Press Intervenors' and PBA's Motions to Intervene*

Rule 24 allows for the intervention of third parties either as a matter of right or upon permission from the court. In order to establish intervention as a matter of right pursuant to Rule 24(a), "the applicant must (1) file a timely motion; (2) claim an interest relating to the property or transaction that is the subject of the action; (3) be so situated that without intervention the disposition of the action may impair that interest; and (4) show that the interest is not already

---

[2] Defendants never filed their summary judgment motion on ECF, but a complete and unredacted courtesy copy of the motion was received in the Clerk's Office on February 20, 2015. *See* DE 56 at 1 (March 6, 2015 letter from defendants noting that they "filed with a Court a hard copy of the fully briefed motion for summary judgment").

adequately represented by existing parties." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 176 (2d Cir. 2001). Alternatively, Rule 24(b) provides that on timely motion the court may permit anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact." "Permissive intervention is wholly discretionary with the trial court." *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Rule 24(b)(3). Courts may also consider "the nature and extent of the intervenors' interests, whether their interests are adequately represented by the other parties, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Id.* at 191-92 (internal quotations marks and citation omitted).

In this case, even if the Press Intervenors are entitled to intervene as a matter of right, the Court need not reach that issue because it grants them permission to intervene pursuant to Rule 24(b). Here, the defendants do not challenge the timeliness of the Press Intervenors' motion, nor do they contend that it would cause undue prejudice. Moreover, the press intervenors' argument for public access to the documents in question is closely related to the dispute in the main action over whether to seal the documents. Furthermore, courts in this Circuit have demonstrated a willingness to allow the press to intervene in situations such as this where the public's access to court documents is at stake. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 123-24 (2d Cir. 2006) (recognizing newspaper's intervention to oppose sealing of summary judgment papers); *see also Doresett v. Cnty. of Nassau*, 762 F. Supp. 2d 500, (E.D.N.Y. 2011) (addressing press applicants' arguments in opposition to defendants' motion for a protective order prohibiting

disclosure of police internal affairs report). As a result, the Court permits the Press Intervenors to intervene.

Similarly, the Court permits the PBA to intervene in order to oppose the Press Intervenors' motion. The PBA has demonstrated its interest in "ensuring that [records relating to the internal investigation] remain sealed" pursuant to New York Civil Rights Law Section 50-a, which will be discussed further below. (PBA's Mem. at 7.) The Press Intervenors oppose the PBA's intervention arguing that "the interests it seeks to protect are identical to the interests of the defendant officers." (Press Intervenors' Mem. in Opp'n to PBA at 2.) They argue that the PBA's "interests are no different in nature, kind or degree from the interests of the fifteen officers who are parties to the litigation." (*Id.* at 3.) Here, however, the PBA's interests are not represented by the defendants such that the Court will not permit its intervention. As noted in *Dorsett v. County of Nassau*, even where the police department is a defendant, "it is not necessarily true that the PBA's interests are aligned with the [department]." 283 F.R.D. 85, 93 (E.D.N.Y. 2012). For as the PBA describes, "[t]he PBA represents the interest of its members – the actual police officers," "[w]hile the County of Suffolk represents the agency as a whole." (PBA's Mem. in Supp. at 8.) Moreover, even if the individual defendant members' interests are represented by the County's attorneys, the PBA has a separate interest in protecting even its non-defendant members since the result of the motion to seal could affect the confidentiality of future internal investigations involving other members. Furthermore, Press Intervenors do not contend that the PBA's motion is untimely or prejudicial and the Court sees no reason to deny the motion on those grounds. As a result, the Court permits the PBA to intervene.

**II.    *Whether the Documents at Issue Should Be Sealed***

7

In this section, the Court will examine whether the documents at issue should be sealed or remain sealed, as may be the case.

**A.      Plaintiff's Summary Judgment Opposition Papers**

**1.      Defendants' Motion to Seal**

Generally, judicial documents are subject to a [common law] presumption in favor of public access. *See United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (*"Amodeo II"*); *Lugosch*, 435 F.3d at 119. A party may overcome this presumption if the court determines that competing considerations weigh in favor of sealing the documents. *Amodeo II*, 71 F.3d at 1050. Those countervailing interests include "the privacy interests of those resisting disclosure." *Id.*

Initially, defendants argue that the summary judgment papers that they seek to redact are not judicial documents. The Second Circuit has defined judicial documents as "items filed with the court that are relevant to the performance of the judicial function and useful in the judicial process." *In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (internal quotation marks and citation omitted). Here, the documents in question were submitted to the Court as part of plaintiff's opposition to the defendants' motion for summary judgment. Moreover, they are relevant to the judicial process, namely, the Court's determination of the defendants' summary judgment motion. *See Lugosch*, 435 F.3d at 121 ("[T]here is a presumption of access to documents submitted on a summary judgment motion."). Therefore, they are judicial documents.

"Once the court has determined that the documents are judicial documents and that therefore a common law presumption of access attaches, it must determine the weight of that presumption. '[T]he weight to be given the presumption of access must be governed by the role

8

of the material at issue in the exercise of Article III judicial power and the resultant value of such

information to those monitoring the federal courts. Generally, the information will fall

somewhere on a continuum from matters that directly affect an adjudication to matters that come

within a court's purview solely to insure their irrelevance.' " *Lugosch*, 435 F.3d at 119 (quoting

*Amodeo II*, 71 F.3d at 1049 (2d Cir. 1995)). However, "documents [like those at issue here] used

by parties moving for, or opposing, summary judgment should not remain under seal absent the

most compelling reasons." *Id.* at 121 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982).

"Finally, after determining the weight of the presumption of access, the court must

'balance competing considerations against it.' " *Id.* at 120 (quoting *Amodeo II*, 71 F.3d at 1050).

"Such countervailing factors include but are not limited to 'the danger of impairing law

enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.' " *Id.*

(quoting *Amodeo II*, 71 F.3d at 1050).

Here, defendants "submit that the [C]onfidentiality [O]rder as well as the protections

afforded to the documents by the law enforcement privilege, overcome any presumption of public

access." (DE 57 at 2.) The Court will first address defendants' argument pertaining to the

Confidentiality Order. As discussed above, pursuant to the confidentiality agreement, the parties

marked as confidential "Suffolk County Police Department Internal Affairs Bureau investigation

files and their attendant attachments." According to defendants, "the requested redactions apply

to portions of the plaintiff's moving papers and exhibits that refer to the Internal Affairs

investigation and report concerning this matter, and the content thereof." (DE 57 at 3.)

However, defendants have not made clear that the summary judgment papers at issue are subject to

the confidentiality agreement. Moreover, a review of the documents at issue indicates that many

9

of the documents reference an internal affairs report and the investigation and the charges brought against defendants, but are not the actual investigation files described by the confidentiality agreement. Most importantly, however, defendants have not pointed to any authority indicating that the mere existence of a confidentiality agreement overcomes the presumption of public access to judicial documents. Courts within this circuit have held contrary to defendants' position, finding that "the mere fact that information is subject to a confidentiality agreement between litigants is not a valid basis to overcome the presumption in favor of public access to judicial documents." *See e.g.*, *In re General Motors LLC Ignition Switch Litigation*, 2015 WL 7574460, at *10 (S.D.N.Y. Nov. 25, 2015). This is true especially where, as here, the confidentiality agreement contemplates that the documents may become public in the future subject to a court determination. *See Lugosch*, 435 F.3d at 126. Therefore, even assuming the summary judgment papers in question were subject to the confidentiality agreement, that fact is not sufficient to overcome the presumption of public access.

Regarding defendants' second basis for overcoming the presumption, the law enforcement privilege, "the party asserting the law enforcement privilege bears the burden of showing that the privilege applies to the documents at issue" by demonstrating "that the documents contain information that the law enforcement privilege is intended to protect." *In re City of New York*, 607 F.3d 923, 944 (2d Cir. 2010). "Such protected information includes information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel or the privacy of individuals involved in an investigation, and information that would otherwise interfere with an investigation." *Id*. at 944 (internal quotation marks, citations, and alterations omitted). "In order

to sustain the privilege, a party 'must make a clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted, and they may not rely simply on generalized reiterations of the policies underlying the privilege.' " *MacNamara v. City of New York*, 2007 WL 1169204, at *5 (S.D.N.Y. Apr. 20, 2007) (quoting *Kunstler v. City of New York*, 2005 WL 2656117, at *1 (S.D.N.Y. Oct. 18, 2005).

Defendants attempt to meet their burden by arguing generally that the privilege applies because "the information in the [IAU] [R]eport concerns law enforcement techniques and procedures, information that would undermine the privacy of individuals involved in the investigation and, if revealed beyond the parties, would seriously impair the ability of law enforcement agencies to conduct future investigations." (DE 57 at 3.) However, defendants' argument is merely a restatement of the type of information the privilege is meant to protect. Moreover, they do not discuss how the specific documents at issue here, which they admit only reference the IAU Report and the investigation, are subject to the law enforcement privilege. Nor have they made a "clear and specific evidentiary showing" of the harm that would occur should the documents be disclosed. As a result, defendants have not met their burden in demonstrating that the privilege applies to the documents at issue.

### 2. Press Intervenors' Opposition to Sealing

Press Intervenors assert that "[b]oth the First Amendment and the common law convey a qualified right of public access to the proceedings and records in this case." (Press Intervenors' Mem. in Supp. at 2.) As discussed above, defendants are unable to overcome the common law presumption. Moreover, as Press Intervenors suggest, "there [also] exists a qualified First Amendment right of access to documents submitted to the court in connection with a summary

judgment motion." *Lugosch*, 435 F.3d at 124. Given that the First Amendment presumption is more difficult to overcome, than that of the common law, *see id.*, defendants have also failed to overcome the First Amendment presumption.

### 3.   PBA's Opposition to Press Intervenors

The PBA in its opposition to the Press Intervenors argues that non-disclosure is appropriate based on New York Civil Rights Law Section 50-a.[3]   That statute provides that "[a]ll personnel records used to evaluate performance toward continued employment or promotion, under the control of any police agency or department of the state . . . shall be considered confidential and not subject to inspection or review without the express written consent of such police officer . . . ."   In *Daily Gazette Co. v. City of Schenectady*, the New York Court of Appeals found that "records of the disciplinary action taken against . . . police officers, including their identities and individual punishments, for possibly very serious misconduct" were the sort meant to be protected by the statute.   93 N.Y.2d 145, 160 (1999).   However, as discussed in *King v. Conde*, "New York state law does not govern discoverability and confidentiality in federal civil rights actions. . . . Moreover, there is no federal analog to New York Civil Rights Law § 50-a.   Questions of privilege in federal civil rights cases are governed by federal law."   121 F.R.D. 180, 186-87 (E.D.N.Y. 1988) (internal citations omitted).   Although the court in that case noted that "[s]tate rules may illustrate important privacy interests, and a strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy," it also noted that "[s]imple direct application of the state rule would be undesirable and improper [and] would often

---

[3] Defendants also make this argument in their Memorandum in Opposition to the Press Intervenors' Motion to Intervene.

frustrate the important federal interests in broad discovery and truth-seeking and the interest in vindicating important federal substantive policy such as that embodied in section 1983." *Id.* at 187 (internal quotation marks and citations omitted). Moreover, the court explained that "[i]n order to assert a claim of privilege against disclosure of police materials to a plaintiff raising federal civil rights claims against a police defendant, the officers or the police department must do more than alert the court to the state privilege law or the generalized policies which support it. The police must make a substantial threshold showing that there are specific harms likely to accrue from disclosure of specific materials." *Id.* at 189 (internal quotation marks and citation omitted). "The [applicant] must specify which documents or class of documents are privileged and for what reasons." *Id.* (internal quotation marks and citations omitted). Moreover, "[u]nless the [applicant], through competent declarations, shows the court *what interests* [of law enforcement or privacy] would be harmed, *how* disclosure . . . would cause the harm, and *how much* harm there would be, the court cannot conduct a meaningful balancing analysis." *Id.* (internal quotation marks and citation omitted). Furthermore the party asserting the privilege must submit a declaration or affidavit, which "must (1) be under oath and penalty of perjury; (2) [be] from a responsible official within the agency who has personal knowledge of the principal matters to be attested to; and (3) [be based] upon personal review of the documents." *Dorsett v. Cty. of Nassau*, 762 F. Supp. 2d 500, 532 (E.D.N.Y. 2011).

Here the PBA relies upon the affidavit of Noel Digerolamo, president of the Suffolk County PBA. That affidavit asks the "Court [to] consider New York State Civil Rights Law and balance the officers' right to privacy versus the *plaintiff*'s need for disclosure." (Digerolamo Aff. ¶ 7.) However, neither the affidavit nor the PBA's brief discuss the specific documents that are

13

subject to the statute, and the Court notes that many of the summary judgment documents at issue are not personnel records that seem to plainly fit within the statute. Moreover, the PBA's submissions do not discuss the harms likely to accrue from disclosure of specific materials, and the affidavit does not demonstrate Digerolamo's personal review of the documents at issue. Therefore, the Court is not persuaded that the summary judgment papers should remain under seal pursuant to the arguments put forth by the PBA.[4]

For all of the aforementioned reasons, the defendants are directed to file the fully briefed summary judgment motion publicly on ECF. In addition, Docket Entries 57, 63, and 66, which consist of defendants' motion to seal and plaintiff's response, shall be unsealed.

## B.  Pre-Motion Letter

As noted above, the Court sealed the plaintiff's pre-motion conference letter upon joint motion of the parties. The Press Intervenors now seek to intervene for the purpose of, *inter alia*, unsealing that letter.

Plaintiff's pre-motion letter refers to the internal affairs investigation as well as the findings of that investigation. It was filed with the Court in an effort to persuade the Court that defendants should not be permitted to file a summary judgment motion as there is evidence supporting plaintiff's claims and questions of material fact that should be presented to a jury. As it was filed with the Court in an effort to persuade the Court on an issue within its judicial function,

---

[4] The affidavit of Inspector Armando Valencia, Commanding Officer of the Internal Affairs Bureau, submitted by the defendants in their opposition to the Press Intervenors' motion, is similarly deficient. Although it acknowledges Inspector Valencia's familiarity with the IAU Report and discusses potential harms resulting from disclosure of that report, it fails to discuss the specific documents at issue in regard to plaintiff's summary judgment opposition. It does not discuss which of those documents, if any, is part of the IAU Report and the specific harms that would result from disclosure of those specific documents.

it is a judicial document. *See Vargas v. CH Hospitality Mgmt., LLC*, 2014 WL 2930462, at *2 (E.D.N.Y Jun. 27, 2014) (finding that letter filed in effort to persuade the court to grant request was "plainly a judicial document").

Even assuming the weight of the presumption afforded to the pre-motion letter is less than that afforded to the summary judgment papers discussed above, defendants' arguments do not persuade the Court that sealing is warranted. For the same reasons as discussed with regard to the summary judgment papers, the confidentiality order does not justify sealing this letter. Moreover, neither defendants nor the PBA has demonstrated why the law enforcement privilege provides justification to seal the letter. As a result, the letter shall be unsealed.

## C. Confidentiality Order

In their opposition to defendants' request to seal certain portions of plaintiff's summary judgment papers, plaintiff "request[s] that the previously entered Order designating [as confidential] the [IAU] Report issued during the discovery period be lifted and the IAU [R]eport no longer be considered a confidential document." [5] (DE 59 at 7.) Defendants have not provided a response to this request. "It is undisputed that a district court retains the power to modify or lift protective orders that it has entered." *In re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139, 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 953 (1987). However, "[w]here there has been reasonable reliance by a party or deponent, a District Court should not modify a protective order granted under Rule 26(c) 'absent a showing of improvidence in the grant of [the] order or

---

[5] The Court notes that the Press Intervenors do not seek to intervene for the purpose of joining plaintiff in this application. Press Intervenors' motion discusses the reasons why documents filed with the Court should not be sealed, but does not address the confidentiality of documents not filed with the Court, i.e., the IAU Report. Accordingly, the Court does not construe their brief to challenge the Confidentiality Order beyond its protection of documents filed with the Court.

some extraordinary circumstance or compelling need.' " *S.E.C. v. TheStreet.Com*, 273 F.3d 222, 229 (2d Cir. 2001) (quoting *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979)).

To the extent any of the documents filed with the Court discussed above are subject to the Confidentiality Order, as already noted, such order does not bar them from being filed publicly pursuant to the common law presumption of public access. To the extent plaintiff wishes to have the Confidentiality Order lifted in its entirety such that even documents not filed with the Court would become public, it is directed to file a formal motion to do so within thirty (30) days of this Order.

## DEFENDANTS' SUMMARY JUDGMENT MOTION

### *BACKGROUND*

The following facts are taken from the parties' Local Rule 56.1 Statements and are undisputed unless otherwise noted.

On December 31, 2010, at approximately 5:38 p.m., Williams called 911 and requested police assistance because her boyfriend Jenkins had taken her car without her consent. She also stated that Jenkins had put his hands on her, but when asked if she was injured or needed an ambulance, she said no. Verwys responded to 1 Spruce Street in Bayshore and on that date completed a domestic incident report ("DIR") relating to the call. The DIR indicates that the incident involved a dispute over a vehicle and that the vehicle was returned. It also indicates that there was a prior domestic violence history between Williams and Jenkins. The area of the report entitled "Suspect Actions," contains a list of various actions including kicking, punching, pushing,

and slapping with an empty circle next to each one. The only circle that Verwys filled in was next to "Other Suspect Actions." Page two of the report contains the following sworn written statement from Williams: "I would like to document that my boyfriend used my car without my consent. When I called the police my car was returned. I just want my things back and for him to leave." The report indicates that no arrest was made because "[n]o [o]ffense [was] [c]ommitted.

On March 13, 2011, a woman named Alysha called 911 requesting police assistance at 103 Third Avenue in Bayshore, New York, and reported that a male was fighting with a nine-month pregnant female and refusing to leave the house after being asked repeatedly. Morge and Vias responded to the call, and Morge completed a DIR relating to the call. The report indicates that both Jenkins and Williams were present when Morge and Vias were at the scene, and that Williams was not injured or fearful. In the area of the report entitled "Suspect Actions," only the circle next to "other suspect actions" was filled in, and the report indicates that there was a verbal dispute. Page two of the DIR contains a sworn written statement by Williams stating the following: "Jason came home late last night and I wasn't happy. Then he called another woman to pick him up. I just want him to leave." The report indicates that no arrest was made relating to the call because no offense was committed. However, the officers arrested Jenkins on two outstanding warrants unrelated to any incident with Williams.

On June 13, 2011 at approximately 3:30 p.m., Brunkard responded to a call at 103 Third Avenue relating to a dispute between Williams and Jenkins. The DIR for that date indicates that Williams and Jenkins had a verbal dispute over rent and that Williams was not injured. Page two of the DIR contains a sworn written statement by Williams stating: "I called the police because me and my boyfriend got in an argument because he didn't want to pay rent. We have been having

problems and I want him to move out. The officer told me to go to court and have him evicted, and that's what I'm going to do." The report indicates that no arrest was made because no offense was committed.

On June 20, 2011, at approximately 7:01 p.m., Shannah Jordan ("Jordan"), Williams's sister, called 911 requesting police assistance at 1 Spruce Street, Bayshore, New York stating that her sister's boyfriend, Jenkins, was throwing stuff in the street including a baby's crib and mattress. Morge and Vias responded to the call. After speaking with Williams, Vias obtained a copy of the DIR from the June 13, 2011 incident. Morge and Vias did not fill out a DIR for the June 20, 2011 incident and "voided"[6] the call. However, they directed Jenkins to return the items he had thrown into the street back to the house. Although he did not initially do so, the officers directed Jenkins to return the items again, and stayed at the scene until Jenkins returned the items to the home and cleaned up the scene by dragging certain items to the dumpster. Although Jenkins and Jordan asked the police to arrest Jenkins, they did not do so and told Williams she would have to go to court to have him evicted.

At approximately 7:40 p.m., on that same date, Williams called 911 requesting police assistance at the same location. She stated that Jenkins was threatening to burn down the house and the items inside of it. She then asked if that was a justification to arrest him and stated, "he's threatening everybody, I don't see how that's OK." She also stated that Jenkins had weapons in the house. Mecurio responded to the call. At his deposition, Mecurio testified that after speaking with Jenkins at the scene, he did not believe Jenkins was threatening to burn the house down. Coleman testified that Mecurio also told Williams that the police couldn't keep coming

---

[6] The term "void" seems to indicate an officer's decision to deem a call similar to a previous call such that he need not fill out a separate DIR.

there and not to call again and instructed her to go upstairs to her sister's apartment and not to speak to Jenkins.

On June 23, 2011 at approximately 8:53 a.m., Williams called 911 requesting police assistance at 1 Spruce Street, Bayshore, New York and stated that she was trying to get her child out of the house and that the baby's father, Jenkins, was standing outside the door, not letting her leave, and trying to snatch the car seat from her hands. She stated he was violent, but that he had no weapons. Brunkard and Aspromgos responded to the call. Jenkins was not at the scene when the police arrived. Aspromgos completed a Suffolk County Police Department Field Report which states that Williams reported she was having visitation issues with Jenkins over their daughter.

On June 25, 2011, at approximately 1:00 p.m., Williams called 911 requesting assistance at 1 Spruce Street. McAuley responded to the call. He testified at his deposition that when he spoke to Williams at the scene, she said that her boyfriend had been there and he didn't want to leave, so she called the police, but when she called he left so she didn't need the police anymore. McAuley also stated that when he asked Williams why her boyfriend was at the house, she said he was there to visit their child, but she did not want him to see her or the child anymore. McAuley stated that he told Williams that he was aware that both he and other officers had been at the home before and told her that she needed to have custody arrangements made in court. According to McAuley, Williams told him that he was just as useless as the other officers and closed the door, ending the conversation. McAuley filled out a DIR noting that Williams walked away from him and refused to give a statement.

On June 28, 2011, Williams filed a petition in Suffolk Family Court seeking an order of

19

protection against Jenkins. On that same date, she was issued a temporary order of protection ("TOP") directing Jenkins, *inter alia*, to stay away from Williams's home. On June 28, 29, and July 7, the Suffolk County Sheriff's Department attempted to serve the TOP on Jenkins, but they were unsuccessful.

On July 4, 2011, at approximately 4:10 p.m., Williams called 911 requesting police assistance at 1 Spruce Street, stating that she had an order of protection against her ex-boyfriend, Jenkins, and that he came to the door of her apartment and when she opened the door he took her baby out of her arms and would not give the baby back to her. O'Callahan responded to the 911 call. O'Callahan stated at his deposition that Williams told him that she gave the baby to Jenkins and that he determined no crime had been committed. He also stated that while at the location, he saw on his computer that there was a TOP issued against Jenkins, but that it had not been served yet. As a result, he determined that there was no probable cause to arrest Jenkins for violating the TOP. However, while at the scene he read the entire TOP to Jenkins from his computer.

On that same date, O'Callahan completed a Suffolk County DIR relating to the call. The report indicates that the incident involved a verbal dispute over custody and that Williams was fearful of Jenkins. Page two of the report contains a sworn written statement signed by Williams containing the following: "My childs father Jason Jenkins 3/14/84 came to take my child Arianna Williams 4/28/11 to a 4th of July party. When he was leaving Jason said he is not going to give the baby back to me. I am afraid Jason is going to try and keep my child. I want to document the incident so I can go to family court and have visitation set up." As of July 4, 20122, there was no court ordered custody or visitation agreement between Williams and Jenkins relating to Arianna Williams.

20

On July 5, 2011, at approximately 1:00 a.m., Williams called 911 requesting police assistance at 1 Spruce Street, stating that her ex-boyfriend didn't bring her child back and that she was advised by an officer earlier in the day that if he did not bring the child back by 1:00 a.m. to call and request an incident report to take to Family Court. At approximately 2:02 a.m., Saleh and Rosado responded to the call. Saleh knocked on the door at 1 Spruce Street, but there was no answer. He requested that the dispatcher attempt to make re-contact with the complainant, but he or she was unable to do so.

Later that day, at approximately 7:45 a.m., Williams called 911 a second time and requested police assistance at 1 Spruce Street because her ex-boyfriend took her daughter and said he was going to bring her home, but he never did. Officers Aspromgos and Brunkard responded to the 911 call. Brunkard testified that Williams told her that Jenkins had not returned with her child since he took her the previous day. He testified that he asked her if she had gotten a custody agreement and she said she had not. According to Brunkard, he told her to call the police if Jenkins did not bring her back later.

At approximately 9:15 p.m. on the same day, Williams called 911 requesting police assistance at 150 Price Parkway, Farmingdale, the PC Richards where Jenkins worked. She stated that Jenkins had taken her daughter the day before, but had not yet returned her and would not tell her if her daughter was okay or where she was. She also stated that a couple of days prior, Jenkins threatened to commit suicide because they were no longer together. Ruiz responded to the call. According to Ruiz's testimony, after arriving on the scene, he separated Jenkins and Williams by about 100 to 150 feet and spoke to them individually. Ruiz testified that Williams told him about her concern for the safety of her baby and that when he asked her if Jenkins had

made any suicidal threats, "she wasn't specific as to how or what he was going to do." Ruiz also testified that he spoke to Jenkins who said that he was not suicidal. According to Ruiz, Jenkins said the baby was staying with his grandmother or cousin in Brooklyn. Jenkins contacted the relative via telephone, and Ruiz spoke to the relative. The relative told Ruiz that Williams could go to Brooklyn and pick up the baby and provided an address. Ruiz also testified that while at the scene, he saw on his computer that there was a TOP issued against Jenkins, but that the order had not been served. He informed Jenkins of the TOP and explained that he was to stay away from Williams.

Ruiz completed a DIR relating to the incident. The report indicates that the incident involved a custody dispute and that Williams was not fearful. Page two contains a sworn written statement signed by Williams stating: "Tonight I went to Jason's job to find out the whereabouts of my daughter Ariana. I feel he's been giving me the run around and keeping her from me, saying she's with his grandma and his cousin in Brooklyn. I just want my baby back now!"

On July 6, 2011, at approximately 12:19 a.m., Jordan called 911 requesting police assistance at 1 Spruce Street. She stated that her sister had an order of protection against her boyfriend and that he kept calling her sister. She also stated that Williams went to the address where Jenkins said the baby was, but the baby was not there. She stated that she and Williams wanted to file a missing person's report for the baby and a harassment complaint against Jenkins. She also stated that Jenkins said he was going to kill himself and the baby. Officers Ortiz and Rosado responded to the call and spoke with Williams at the scene. Rosado testified that Williams told him she had called the police earlier from her ex-boyfriend's job. Rosado explained that he was able to confirm the prior call and determined that the nature of the call they

were responding to on July 6 was the same as the nature of the July 5th call from Price Parkway. According to Rosado, he did not complete a DIR for the call, but rather "voided" the call to the July 5th call by notifying the dispatcher over the radio.

On July 8, 2011 Suffolk Deputy Sherriff Sergeant Michael Smith learned from Williams that Jason Jenkins was working at the aforementioned PC Richards. After speaking with her, he responded to the PC Richards location and at approximately 8:20 p.m., observed a male leaving the store matching the description of Jenkins, approached that person, and confirmed that he was in fact Jenkins. According to Smith, he then personally served Jenkins with a copy of the TOP, read its entire contents to him, and advised him of the ramifications of violating the order. Smith stated that he asked Jenkins if he understood the terms of the order, and he indicated that he did and that he did not have any questions regarding the order.

On July 12, 2011, Jenkins shot and killed Williams. Jenkins then killed himself.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material: "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the

23

basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012); *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009). The non-movant must present more than a "scintilla of evidence," *Fabrikant v. French,* 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson,* 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986)), and cannot rely on the allegations in his or her pleadings, on conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange,* 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir. 1994).

The district court, in considering a summary judgment motion, must also be mindful of the underlying burdens of proof because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, "the moving party's burden under Rule 56 will be

satisfied if he can point to an absence of evidence to support an essential element of the" non-movant's claim. *Crawford v. Franklin Credit Mgmt. Corp.,* 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady,* 863 F.2d at 210–11). Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to present sufficient evidence in support of his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Brady,* F.2d at 211 (citing *Matsushita,* 475 U.S. at 587). "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford,* 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

## II.    *Plaintiff's Due Process Claims*

"Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.' " *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir.1995) (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir. 1994)). In *Deshaney v. Winnebago County Department of Social Services,* the Supreme Court announced that "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. 189, 197 (1989). However, the Second Circuit later held that under the state-created-danger doctrine, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Okin v. Village of Cornwall-on-Hudson Police Department,* 577 F.3d 415, 429 (2d Cir. 2009).[7] To be liable under

---

[7] The state-created danger doctrine is analyzed pursuant to a plaintiff's claim of

25

that doctrine, "[t]he State actor must have engaged in 'affirmative' conduct that actively facilitated the danger to the plaintiff; 'passive failure to stop private violence' will not suffice to establish a state-create[d] danger." *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F Supp. 3d 176, 204 (E.D.N.Y. 2014) (quoting *Pena v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005)).

"The Second Circuit has recognized that '[d]istinguishing between "active" and "passive" facilitation can of course sometimes be difficult.' " *Marquis-Abrams*, 46 F. Supp. 3d at 204 (citing *Pena*, 432 F.3d at 110). What is clear, however, is that "liability arises from the relationship between the state and the private assailant." *Pena*, 432 F.3d at 109. The Second Circuit has maintained that "the state created dangers recognized in [its] precedents [involved situations where] a third party's criminal behavior harmed the plaintiff after a government actor – always a law enforcement officer – enhanced or created the opportunity for the criminal act through some interaction or relationship with the wrongdoer." *Lombardi v. Whitman*, 485 F.3d 73, 80 (2d Cir. 2007). Moreover, the Second Circuit summarized the relationships between law enforcement and private actors present in previous cases where it found sufficient allegations of state-created danger as follows: "[i]n *Dwares* [*v. City of New York*, 985 F.2d 94 (2d Cir. 1993)], the police allegedly gave the green light for skinheads to assault a group of flag-burners; in *Hemphill* [*v. Schott*, 141 F.3d 412 (2d Cir. 1998)], the police allegedly gave back a robbery victim's gun and took him along on a chase after the robber, who was shot by the robbery victim; in *Pena*, the police

---

substantive due process. *See Cooper v. City of New York*, 2014 WL 5315074, at *3 (S.D.N.Y. Oct. 17, 2014) (state-created danger doctrine provides for a possible substantive due process claim). Plaintiff's brief is confusing because it discusses *Okin*, a state-created-danger case, under both the headings of procedural and substantive due process. However, "[w]hether the court views the claim as one for procedural or substantive due process, it cannot succeed," as discussed further below. *Konashenko v. Federal Emergency Mgmt. Agency*, 2014 WL 1761346, at *7 (E.D.N.Y. Apr. 29, 2014).

allegedly encouraged drinking and driving by a fellow officer who hit several pedestrians while under the influence." *Id.* More recently in *Okin*, the Second Circuit denied summary judgment for the defendants where there was evidence that police officers responding to domestic violence complaints "implicitly but affirmatively encouraged . . . domestic violence." *Okin*, 577 F.3d at 430. Specifically, the officers "openly expressed camaraderie with [the assailant] and contempt for [the plaintiff]" by "discussing football with [the assailant] during their response to [plaintiff's] complaint that he had beaten and tried to choke her." *Id.* Additionally, the court found that there was evidence that officers "repeatedly communicated to [the assailant] that his violence would go unpunished, as when [he] told [an officer] that he could not 'help it sometimes when he smacks [plaintiff] around' and [the officer] made no arrest, and also, on the numerous occasions that defendants responded to [plaintiff's] complaints without filing a domestic incident report, interviewing [the assailant], or making an arrest." *Id.*

Defendants argue that this case is governed by *Deshaney* and that the police action at issue does not fit within the category of state-created-danger. In particular, the defendants note that "critical to the holdings in *Dwares*, *Pena*, and *Okin*, and other cases where the state-created danger [doctrine] was held to apply, is the fact that an agent of the State, typically, a law enforcement officer, was shown to have had a particular relationship with the perpetrator of the violence on the victim." (Defs.' Mem. in Supp. at 17.) Plaintiff does not address this argument other than to say that the relationship between the defendants and the assailant was one of the many factors the court considered in *Okin*. Generally, plaintiff argues that "[b]y continually failing in their duties, and failing to enforce New York Penal Law to protect Ms. Williams, Defendant SCPD Officers repeatedly gave Mr. Jenkins assurances that he could act with impunity, in harassing and abusing

Ms. Williams and her property without fear of arrest." (Pl.'s Mem. in Opp'n at 9.) Indeed, in *Okin*, the Second Circuit noted "that repeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute prior assurances, rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin*, 577 F.3d at 428 (internal quotation marks and citations omitted). This is not a case of explicit affirmative communication by law enforcement, however, in light of *Okin*, the Court must consider whether there is evidence that the defendant officers implicitly, but affirmatively, communicated approval of Jenkins's murder of Williams.

The Court will first examine what, if any, relationship the evidence suggests defendant officers had with Jenkins. Plaintiff does not point to any interactions officers had with Jenkins that suggest the same kind of camaraderie with the assailant and contempt for the plaintiff present in *Okin*. Moreover, Jenkins was not even present on some of the occasions where officers responded to 911 calls. Plaintiff points to testimony from Williams's sister stating that during the July 4, 2011 incident, an officer told Williams that he would arrest her if she continued to fight with Mr. Jenkins about the baby. Even if this statement could be construed as displaying camaraderie with Jenkins, there is no indication that Jenkins was a participant in that conversation or even heard officers speaking to Williams. Similarly, the plaintiff points to testimony from Coleman stating that during the June 20, 2011 incident, officers told Williams not to call the police again and to go upstairs to her sister's apartment, but do not point to any evidence that Jenkins heard these comments. The Court cannot infer that the police communicated a condoning of Jenkins's conduct where "[p]laintiff[] offer[s] no evidence to support the notion that [Jenkins] was aware of" the officers' comments or that he "inferred from [them] a green light to escalate" his

28

actions toward Williams to murder. *Chambers v. North Rockland Central Sch. Dist.*, 815 F. Supp. 2d 753, 768 (S.D.N.Y. 2011).

Additionally, plaintiff has not raised a genuine question of fact with regard to whether the officers' responses rose to the level of an affirmative condoning of Jenkins's violence. There is no evidence suggesting that the defendant officers ignored any explicit admission of violence from Jenkins, unlike in *Okin*, where the police took no action in response to the assailant's admission of physically smack[ing] [the plaintiff] around. Significant to the Court's analysis is that the incidents in *Okin* involved complaints of physical violence and threats, such as complaints that the assailant was beating and choking the plaintiff and threatened to shoot her, while the evidence here, including Williams's signed statements, indicates that the complaints to which the police responded mainly involved verbal disputes over rent and child custody. Since none of these incidents involved complaints of physical violence of the type repeatedly expressed in *Okin*, the officers' responses to them cannot be said to have implicitly and affirmatively communicated to Jenkins that he could physically abuse Williams with impunity. Moreover, the officers did not ignore complaints about Jenkins's more alarming behavior. For example, on the occasion that Jenkins was throwing Williams's property into the street, the responding officers directed Jenkins to return the items the home and clean up the mess. Additionally, the officers responding to the calls regarding Jenkins's threats to burn Williams's house down and to commit suicide testified that they interviewed Jenkins and did not deem these threats legitimate, and plaintiff has not pointed to any evidence to refute this testimony. Furthermore, on at least two occasions, officers advised Jenkins of the TOP and to stay away from Williams.

Although plaintiff claims that many of Jenkins's actions violated New York State penal

law and should have resulted in arrest, she does not explain which laws were violated or why defendants were required to make an arrest under any of the specific circumstances of the numerous occasions on which they responded to the 911 calls. Additionally, it is undisputed that the officers filled out DIRs on most occasions, and plaintiff has failed to explain why their failure to do so on specific occasions was inappropriate. Moreover, plaintiff's reliance on the fact that the defendant officers underwent an internal investigation regarding their responses to the 911 calls is not persuasive. The evidence suggests that any misconduct on the part of the defendants in their responses amounted to a " 'failure to prevent misbehavior,' which is precisely what Second Circuit precedent cautions cannot constitute a state-created danger," rather than an implicit affirmative communication that Jenkins could physically harm, no less kill, Williams. *Marquis-Abrams*, 46 F. Supp. 3d at 205 (quoting *Pena*, 432 F.3d at 110) (finding that state agency's failure to screen and monitor foster parent did not amount to affirmative communication that she could abuse children with impunity). As a result, the plaintiff's due process claims against the officer defendants are dismissed.

*Claims against Torres, Pouletsos, and Love*

Defendants argue that the claims against Torres, Pouletsos, and Love should be dismissed because they were not personally involved in the alleged due process violations. According to defendants, "Pouletsos and Torres are not police officers, [but] they are civilian radio dispatch officers employed by the County of Suffolk." (Defs.' Mem. in Supp. at 26.) Defendants state that neither of them was at the scene of any of the events underlying plaintiff's claim, and they did not have any contact with Jenkins. Plaintiff does not respond to this argument and has not raised a genuine question of fact that Torres or Pouletsos was involved in any alleged due process

violation.

With regard to Love, it is undisputed that he conducted the internal affairs investigation of the other defendant officers. Defendants argue that "Love's lack of meaningful investigation and prosecution of the charges against Defendant SCPD Officers condones the unconstitutional deprivation of rights for current and future victims of domestic violence." (Pl.'s Mem. in Opp'n at 19.) Moreover, they argue that Love should be held liable for "gross negligence in the supervision of subordinates" who purportedly committed due process violations. (*Id.* at 18.) However, as discussed above, defendants have not raised any evidence of an underlying due process violation, let alone, that Love was grossly negligent in supervising the other defendant officers. Therefore, plaintiff's claims against Love, Pouletsos, and Torres are dismissed.

*Conspiracy Claims and Municipal Liability*

Since the Court has not found any underlying due process violation, plaintiff's *Monell* claim is also dismissed. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (upholding district court's "decision not to address the municipal defendants' liability under *Monell*" where it "properly found no underlying constitutional violation"). Similarly, plaintiff's claim that defendant officers conspired with Jenkins to violate Williams's due process rights is also dismissed as plaintiff has not pointed to any evidence suggesting that the defendant officers and Jenkins agreed to violated Williams's rights. *See Cambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (pursuant to § 1983 conspiracy claim, plaintiff must establish "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages").

***III.  State Claims***

31

Plaintiff asserts state law claims for negligence, vicarious liability, abuse of process, wrongful death, and loss of consortium and parental care. Defendants request that "in light of a lack of a viable federal claim . . . the Court decline jurisdiction of the plaintiff[']s state claims." (Defs.' Mem. in Supp. at 27.) Pursuant to 28 U.S.C. § 1367(c)(3), the Court "may decline to exercise supplemental jurisdiction" over a state law claim when the Court "has dismissed all claims over which it has original jurisdiction." Having dismissed plaintiff's federal constitutional claims, there is no longer any independent basis for federal jurisdiction in this action. Therefore, pursuant to 28 U.S.C. § 1367, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims.

## *CONCLUSION*

For the reasons set forth above, defendants' motion for summary judgment is granted. However, defendants' motion to seal is denied. The Press Intervenors' and PBA's motions to intervene are granted. Defendants are to file all summary judgment papers on the public docket within seven (7) days of this Order. Additionally, Docket Entries 49, 57, 63, and 66 shall be unsealed.

**SO ORDERED.**

Dated: Central Islip, New York
       March 31, 2016


/s/ _____
Denis R. Hurley
Unites States District Judge